No. 28,910.

THE FIRST STATE BANK OF CEDAR BLUFFS, *Appellant*, v. ROBERT KENNEDY, *Appellee*.

(285 Pac. 602.)

Opinion filed March 8, 1930.

*W. S. Langmade, W. T. Wolfe,* both of Oberlin, *John F. Cordeal, Frank M. Colfer* and *Carson Russell,* all of McCook, Neb., for the appellant.

*A. C. T. Geiger,* of Oberlin, *J. F. Bennett* and *W. E. Mahin,* both of Norton, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to recover on a promissory note. The defense was the note was given for the purpose of guaranteeing, conditionally, bank paper adjudged to be bad, and the condition to liability on the note was not performed. Defendant prevailed, and the bank appeals.

In connection with reorganization of the bank, which had been closed by the bank commissioner, Harry S. Kennedy sold the capital stock and surplus to E. S. Kirkland, R. H. Craig and H. C. Smith. Kennedy was to take out of the assets of the bank slow paper to the amount of $15,000. To secure the bank against loss on other assets turned over to the bank, Kennedy agreed to assign the slow paper to the bank, which he did. The contract provided that collections, if any, on slow paper were to be placed in a separate account, to guarantee any paper adjudged bad within a fixed period, which was afterwards extended. Further to secure against loss on paper determined to be bad within the period, Kennedy assigned to the bank his personal assets and his equities in lands which he owned.

Kennedy further obtained an outside guaranty, to the extent of $15,000, of paper which should be adjudged to be bad within the period. The outside guaranty was not to become effective until Kennedy's assignment was exhausted.

The outside guaranty was effected in part by contracts, pursuant to which the guarantors gave notes to the extent of the individual liability each one assumed. Seven notes of this character were executed and delivered to the bank, totaling $11,500. One of the notes was that of defendant for $2,500. The note sued on, for $1,800, is a renewal of the original note. To complete the outside guaranty to the extent of $15,000, Baxter B. Austin made a deed of 400 acres of land to the bank for an agreed consideration of $5,000. The Kennedy lands and the Austin land were mortgaged. Some of the mortgages were foreclosed, and the bank claimed nothing was realized to apply on the guaranty. Guarantors other than defendant paid their notes, and the guaranty fund was credited accordingly with $9,000.

The assignments of error which are of consequence are that there was nothing to submit to the jury, judgment should have been rendered for plaintiff on the evidence, and the judgment for defendant is not sustained by any evidence.

Craig became cashier when the reorganized bank commenced business, and continued to be cashier during the period material to the controversy. He was the bank's chief witness, and gave the following testimony:

"We charged off $13,187.34. We collected over $1,100 of this amount. We selected other notes to make up the $15,000. Among them was the Dick Fister note of $900. The Fister note was paid, but we didn't credit the guaranty account with the money. We charged off J. K. Moore $781.34, Dick Fister $2,480, and Dick Fister $800. We were paid the $2,400 Fister note and the Moore note and the $900 Fister note. These notes were not credited to the guarantor's account. We charged off so many notes, I wouldn't attempt to say which ones were charged to the guaranty fund."

The bank furnished a list of notes charged off on January 7, 1922, to the total amount of $13,187.34. This was regarded as maturing the guaranty to that extent, and on the following day the notes given by the guarantors were put in the bank, and interest subsequently paid on them was appropriated by the bank. Later, four other notes were charged off, bringing the amount up to $24,927.34. The bank's brief contains the following:

"It will be observed from the foregoing tabulations that on these several dates notes aggregating $24,927.34 were charged off, which, it is needless to say, is equivalent to being 'adjudged bad.' . . .

"The record shows that on January 7, 1922, notes aggregating $13,187.34; on June 27, 1922, notes aggregating $7,050, and on September 23, 1922, notes aggregating $4,690, were charged off. This certainly comes within the terms of the contract of March 10, 1921. How, more certainly than was done in these instances, the particular assets in question could have been adjudged bad, it is impossible to conceive.

. . . . . . . . . . . . .

"The act of charging off the several notes that were removed from the assets of the bank constituted an adjudication that they were bad. . . ."

There was some dispute about whether the guaranty fund should be credited with a Richardson note. The bank's brief contains the following:

"Let that be as it may, giving the guaranty account credit for the amount of the Richardson note, it will stand thus:

"Guarantors' notes, not including defendant...................... $9,000.00
Collected on paper that was charged off........................·.... 1,159.82
Check to Harry S. Kennedy that should have been credited to the
   guaranty account ......................................... 231.29
Richardson note .......................................... 1,200.00

·Total ................................................ $11,591.11"

The list of notes charged off on January 7, 1922, amounting to $13,187.34, will be called, for convenience, list A. The four notes subsequently charged off need not be further considered.

In order to define what the guarantors were guaranteeing, it was provided in the contract that paper should be adjudged bad within a time limit. List A was charged off in compliance with the contract, or it was not. In its brief the bank took the position list A was paper adjudged bad. The same position was taken in the oral argument when the cause was submitted. That being true, the guaranty fund was properly given credit for $1,159.82 produced by list A. Craig, however, said list A did not embrace paper adjudged bad, and the guaranty fund should not be credited with the $1,159.82 produced by list A. In a supplemental brief filed by the bank since the cause was submitted, it is said:

"The amount collected on paper that had been charged off was $1,159.82. This should not be credited to the guarantors' account any more than should the amounts collected on the good notes that were in the bank."

Pursuant to this theory, the supplemental brief states the guaranty fund account as follows:

"The amount collected by the plaintiff from the guarantors, other
than the defendant, was.................................... $9,000.00
The total amount realized out of Harry S. Kennedy's property
was ...................................................... 231.29

Making a total of ....................................... $9,231.29"

It will be recalled that, according to the bank's view, to charge off a note was to adjudge it bad, within the meaning of the guaranty contract. Craig testified the J. K. Moore note of $781.34 and the Dick Fister note of $2,480 were charged off, were paid, and the guaranty fund received no credit. Craig further testified so many notes were charged off (adjudged bad) he would not attempt to say which ones were charged to the guaranty fund. The result is, there never was any list of notes adjudged bad constituting a body of paper to which the guaranty would apply; there never was any action in the nature of adjudging paper to be bad as related to the guaranty; and the bank took a course which left it free to juggle the paper so that if a note which was charged off was subsequently paid, the note had not been adjudged bad as against the guarantors.

As indicated, there was a dispute about the Williamson note. The bank relied on Craig's testimony, as it did with respect to other matters concerning which the bank's brief says, "Mr. Craig's testimony must be accepted."

It will be recalled Kennedy took out of the bank slow paper amounting to $15,000, which he put back in the bank further to secure paper adjudged to be bad. Concerning these notes Craig testified in his first cross-examination, "These were of no value." Concerning these notes the bank's brief says:

"They proved to be of no value whatever, and no part of any one of them was ever paid."

Referring to list A, Craig testified, as quoted above, list A was not the list of slow paper amounting to $15,000 which Kennedy took out of the bank and then put back. Craig said other notes were selected to make up the $15,000, the Dick Fister note of $900 was one of them, and that note was paid but the guaranty fund received no credit. If Craig was referring to some selection of paper adjudged to be bad amounting to $15,000 he was guilty of bad faith toward the guarantors in handling the guaranty fund. The result is, Craig's credibility was a matter for the jury to determine, and it may have disregarded a lot of his statements and explanations.

Plaintiff assigns as error a ruling of the district court imposing the burden of proof on plaintiff. No such ruling is disclosed by the abstract, which merely shows that plaintiff introduced its evidence first. It is not now material who opened. It was a fair inference from the evidence that plaintiff did not in good faith comply with the condition on which liability of defendant on his note depended. Consequently, it is not necessary to state a guaranty-fund account. If it were, some queer things might be considered.

Kennedy assigned to the bank his equity in his lands to guarantee paper adjudged to be bad, and this equity was to be exhausted before the outside guaranty came into effect. In a supplemental agreement made with Kirkland as president of the bank and for the bank, Kennedy listed the various tracts of land. Kennedy could not dispose of his equities, because they were pledged to the bank. The bank could dispose of nothing except what it got by Kennedy's assignments. Whatever the bank received would go to the credit of the guaranty fund. Any other disposition of Kennedy's land by Kennedy or the bank would violate the terms of the guaranty.

Craig bought lots on which Kennedy's residence stood, and paid $3,000 in cash for them. Craig also bought a tract of land containing 100 acres, and paid $4,000 for it. Afterwards Craig sold the lots and land for $8,500. The guaranty fund got nothing. Kirkland took all the money. Kirkland held a mortgage on the Kennedy lots, and Kirkland applied the purchase price of the lots on his mortgage. Kirkland had held a Kennedy mortgage on the 100-acre tract, but had assigned it. Kirkland applied the purchase price of the tract on the mortgage. Kirkland himself got a 67-acre tract of Kennedy's land. Kirkland did not testify at the trial.

The counter abstract contains the following:

*"Cross-examination* (of Craig):

"Q. I want to go back to what is known as the Mount land. A. Yes, sir.

"Q. That land was listed among the assets of Harry Kennedy, wasn't it? A. Yes, sir.

"Q. Do you know what became of that? A. Yes.

"Q. What was done with it? A. We gave $40 an acre for that land.

"Q. Who? A. Mr. Kirkland, and there was something over $8,000 against it to Benton & Hopkins.

"Q. What was done with the difference between the $40 an acre and the indebtedness? A. Credited it up to some of Harry Kennedy's and Bud Austin's notes in the bank.

"Q. That was a private transaction between Mr. Kirkland, yourself, and Harry Kennedy, wasn't it? A. Yes, sir.

"Q. And not a dime of the money went into the guarantor's fund, did it? A. I don't think it did."

Without pursuing the subject further, the court concludes there was sufficient evidence to sustain the verdict.

The judgment of the district court is affirmed.